

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

THE ESTATE OF IRMA ESPINOZA by and through its successors-in-interest RAQUEL ESPINOZA, RAQUEL ESPINOZA, ADRIAN ESPINOZA AND Y.E., through her guardian ad litem JUAN ESPINOZA,

                      Plaintiffs,

v.

COUNTY OF SAN DIEGO, KELLY MARTINEZ and DOES 1-10,

                      Defendants.

Case No.:  25CV3835-GPC(BLM)

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND**

**[Dkt. No. 7.]**

Before the Court is Defendants' motion to dismiss the complaint pursuant to Federal Rule of Civil Procedures 12(b)(6).  (Dkt. No. 7.)  Plaintiffs filed an opposition and Defendants replied.  (Dkt. Nos. 12, 13.)  Based on the reasoning below, the Court GRANTS in part and DENIES in part Defendants' motion to dismiss with leave to amend.

## Background

On December 30, 2025, Plaintiffs the Estate of Irma Espinoza, by and through its successor-in-interest Raquel Espinoza; Raquel Espinoza; Adrian Espinoza; and Y.E.,

25CV3835-GPC(BLM)

through her guardian ad litem Juan Espinoza filed a 42 U.S.C. § 1983 complaint against the County of San Diego, Kelly Martinez, Sheriff of the County of San Diego, ("Sheriff Martinez"), and Does 1-10. (Dkt. No. 1, Compl.) Raquel Espinoza, Adrian Espinoza and Y.E. are the three children of decedent Irma Espinoza. (*Id.* ¶ 4.) Doe 1 is a Sheriff's deputy, and Does 2-10 are believed to be deputies or supervisors who were involved in the alleged incident. (*Id.* ¶¶ 18, 31.)

On Sunday, July 27, 2025, Richard Quinones ("Mr. Quinones") encountered Irma Espinoza ("Ms. Espinoza"), who was neatly dressed, wearing a hat, black pants and a blouse and carrying a small backpack, near his home in Lemon Grove. (*Id.* ¶¶ 21, 22.) Ms. Espinoza was fanning her face with her hand saying, "It's hot, it's hot" and Mr. Quinones gave her two water bottles. (*Id.* ¶¶ 23, 24.)

On the morning of Tuesday, July 29, 2025, while walking his two dogs, Mr. Quinones saw Ms. Espinoza partway down the side of a nearby ditch across the street from his home. (*Id.* ¶ 25.) Mr. Quinones thought it was odd that Ms. Espinoza was neatly dressed but she was sitting on dirt near the trolley tracks with her legs partially submerged in muddy water. (*Id.* ¶ 26.) When Mr. Quinones asked Ms. Espinoza if she needed help. She said "yes." (*Id.* ¶ 27.) Mr. Quinones called the San Diego Sheriff's Office nonemergency line around 8:35 a.m. asking for a welfare check, informing Dispatch that a woman was sitting in a ditch and he was concerned because she had no food or water. (*Id.* ¶¶ 28, 29.)

Then, Mr. Quinones walked across the street to the RV where he resides to take his dogs in and from the window of his RV, he saw Doe 1, a female Sheriff's deputy, arrive in an SUV at approximately 8:57 a.m. (*Id.* ¶¶ 30, 31.) The SUV stopped momentarily by Ms. Espinoza's location and then drove off without even stepping outside her SUV to check on her welfare. (*Id.* ¶¶ 32, 33, 36, 37.) At 8:59 a.m., Doe 1 logged in "GA" or "gone on arrival" into the San Diego Sheriff Officer's computer system. (*Id.* ¶ 34.) But Ms. Espinoza was still sitting partway down the side of a ditch next to where the patrol car had stopped. (*Id.* ¶ 35.)

25CV3835-GPC(BLM)

Mr. Quinones waited for the deputy, medical personnel or an ambulance to return to check on Ms. Espinoza but no one came. (*Id.* ¶¶ 38, 39.) At 9:04 a.m., Mr. Quinones called the San Diego Sheriff's non-emergency line again to report that the woman remained near the ditch and was not gone as Doe 1 had reported. (*Id.* ¶ 40.) At 9:05 a.m., Dispatch contacted Doe 1 to relay that Mr. Quinones was calling again for the second time to report a woman in distress who remained in the ditch. (*Id.* ¶ 41.) About ten seconds later, Doe 1 told Dispatch that she was on her way back to the scene but she never returned. (*Id.* ¶¶ 42, 43.) Instead, at 9:06 a.m., Doe 1 called Mr. Quinones while he was still on the call with Dispatch so he hung up the call with Dispatch. (*Id.* ¶¶ 44, 45, 46.)

Doe 1, describing Ms. Espinoza, told Mr. Quinones "She's a transient." and "Get used to it." (*Id.* ¶ 47.) Doe 1 sounded angry and irritated that Mr. Quinones had called again and in a threatening tone told Mr. Quinones that there were going to be more "transients" and to "get used to it" and leave it alone. (*Id.* ¶¶ 48, 49.) Doe 1 continued on for a minute or longer telling Mr. Quinones to leave the situation alone. (*Id.* ¶ 50.) Mr. Quinones felt intimidated by the call and believed he would get in trouble if he called for help a third time. (*Id.* ¶ 51.) Because each call he made had been routed only to Doe 1, he believed any additional calls would be routed to the same, angry deputy. (*Id.* ¶ 52.) Mr. Quinones also did not feel safe to go check on Ms. Espinoza because Doe 1 had sternly and repeatedly told him to leave the situation alone. (*Id.* ¶ 53.) Doe 1 "cleared" the call at 9:09 a.m. (*Id.* ¶ 54.) Before "clearing" this call, Doe 1 did nothing to check on Ms. Espinoza's welfare or to ask Mr. Quinones what he had observed or why he had called. (*Id.* ¶ 55.)

Does 2-4 were Doe 1's supervisors who had access to Doe 1's activities in real time and knew that Doe 1 had spent less than two minutes at a scene where a concerned citizen had reported a woman in serious distress with no food or water sitting in a ditch. (*Id.* ¶ 56.) Does 2-4 also saw in real time that the Mr. Quinones had called again to complain that their subordinate had driven off without assisting an individual in distress

3

and knew Ms. Espinoza was still in a ditch. (*Id.* ¶¶ 57, 58.) They could see that Doe 1 reported that she was returning back to the scene but that she had never bothered to return and knew that this false report would prevent other deputies from responding to the scene. (*Id.* ¶ 59.) Does 2-4 did not do anything to make sure that Doe 1 returned to the scene or send another deputy to conduct the welfare check. (*Id.* ¶ 60.) After Doe 1's angry call, Mr. Quinones was scared and intimidated and as such, did nothing the rest of the day to check on Ms. Espinoza. (*Id.* ¶ 61.) When Mr. Quinones went out that evening, Ms. Espinoza was no longer there. (*Id.* ¶ 62.)

On Wednesday and Thursday, while walking his dogs, Mr. Quinones did not see Ms. Espinoza in the ditch that was filled with thick reeds around 15 feet tall. (*Id.* ¶ 64.) Another neighbor who was walking her dogs on the same street saw a man coming out of the area where Ms. Espinoza had been last seen acting suspiciously but he hurried away when he saw the neighbor. (*Id.* ¶¶ 64, 65.) That neighbor saw Ms. Espinoza's backpack on the side of the ditch but did not see Ms. Espinoza. (*Id.* ¶ 64.) That neighbor did not call the police because she knew that Mr. Quinones had already called the Sheriff's Office and that a deputy had forcefully told him to leave the situation alone. (*Id.* ¶ 66.)

On the morning of Friday, August 1, 2025, Mr. Quinones was again walking his dogs and when they crossed the street, the dogs' ears perked up near the ditch, and stopped walking. (*Id.* ¶¶ 67, 68.) Mr. Quinones then heard a faint moan coming out of the reeds. (*Id.* ¶ 69.) When he got closer, he saw a woman, half-naked and covered in ants, lying hidden behind a wall of cattails, with her face almost below the water line. (*Id.* ¶¶ 70, 71.) At 7 a.m., Mr. Quinones called 911 and reported that a woman was in the ditch in the water. (*Id.* ¶ 72.) He then attempted to pull Ms. Espinoza out of the water himself, but disabilities from previous back and neck surgeries prevented him from getting her out. (*Id.* ¶ 73.) According to the Dispatch log, Mr. Quinones repeatedly said, "I have to get her out." (*Id.* ¶ 74.) A few minutes after the 911 call, first responders arrived and pulled Ms. Espinoza out of the ditch and placed her on a stretcher. (*Id.* ¶¶ 75,

25CV3835-GPC(BLM)

76.) When the first responders pulled her out at about 7:07 a.m., Ms. Espinoza had agonal breathing and heavy ant activity over the entirety of her body. (*Id.* ¶ 88.)

The deputies reported the following to Dispatch

• "FEM HALF SUBMERGED"

• "COVERED IN ANTS"

• "BODY IS STIFF"

• "POSS RIGOR MORTIS"

(*Id.* ¶ 77.)  Ms. Espinoza was wearing no pants and her body was covered in ants. (*Id.* ¶ 79, 80.)  Ms. Espinoza suffered cardiac arrest and CPR was performed and then she was taken to Sharp Grossmont Hospital. (*Id.* ¶ 81.)  She had hypothermia and contusions and petechiae all over her body. (*Id.* ¶ 88.)  When she arrived at the hospital, her body temperature was 24 degrees Celsius, or about 75 degrees Fahrenheit. (*Id.*)  A body temperature of 24 degrees constitutes a severe stage of hypothermia where the system shuts down and the heart becomes unstable. (*Id.* ¶ 89.)  She was also suffering from aspiration pneumonia. (*Id.* ¶ 92.)  In addition to a heart attack, Ms. Espinoza developed Disseminated Intravascular Coagulation (DIC) at the hospital, a serious condition where widespread clotting leads to damaged organs and severe bleeding. (*Id.* ¶ 93.)  Her lower extremities became ischemic (lacking blood flow) and mottled (purplish, patchy skin) signaling severe blockage of circulation. (*Id.*)

Ms. Espinoza also had a multitude of external injuries. (*Id.* ¶ 94.)  She had multiple brown abrasions, measuring up to 2 inches on her midforehead, left lateral temple and around the left eye as well as abrasions on and under her chin. (*Id.* ¶¶ 94, 95.)  She also had multiple bruises on the right and left lateral torso and on her whole back. (*Id.* ¶ 96.)  There were contusions on her mid-chest, measuring up to 1/2 inch in diameter. (*Id.* ¶ 97.)  There were purple contusions on the anterior left lower leg measuring up to 1 inch. (*Id.* ¶ 98.)  Mr. Quinones had not seen any marks or injuries on Ms. Espinoza until the day she was pulled out of the ditch. (*Id.* ¶ 99.)  Despite multiple bruises and contusions all over her body and clear indication of hypothermia and cardiac arrest, the

25CV3835-GPC(BLM)

Medical Examiner labeled the cause of Ms. Espinoza's death as COMPLICATIONS OF CHRONIC ALCOHOL ABUSE WITH HEPATIC CIRRHOSIS AND ACUTE PANCREATITIS. (*Id.* ¶ 101.) The autopsy report omitted any reference to the physical evidence of bruises, contusions, and petechiae. (*Id.* ¶ 102.) The autopsy report did not state whether a swab to detect evidence of sexual assault had been taken despite the fact that Ms. Espinoza was found half-naked. (*Id.* ¶ 103.) While the Medical Examiner investigator sent a courier to Sharp Grossmont Hospital for antemortem specimen, there was no request for any sex assault swabs or records. (*Id.* ¶ 104.)

Despite multiple references in the record that Ms. Espinoza was submerged in the water in a ditch, forensic pathologist, Dr. Brankica Paunovic, claimed "it is unknown if there was water in the drain." (*Id.* ¶ 105.) Because Dr. Paunovic did not consider Ms. Espinoza's exposure to cold water, his findings are incomplete at best. (*Id.*) The autopsy listed acute pancreatitis and disseminated intravascular coagulation as evidence of chronic alcohol abuse even though these are symptoms of hypothermia. ((*Id.* ¶ 106.) At the time of her death, Ms. Espinoza was 43 years old. (*Id.* ¶ 100.)

Plaintiffs allege seven causes of action: (1) due process violation under 42 U.S.C. § 1983 against Doe 1 ; (2) right of association under 42 U.S.C. § 1983 against Doe 1; (3) failure to properly investigate, supervise, and discipline under 42 U.S.C. § 1983 against Sheriff Martinez and Supervisory Doe Defendants 2-10; (4) *Monell* violation based on an unconstitutional custom, policy or practice under 42 U.S.C. § 1983 against the County of San Diego; (5) wrongful death, Cal. Civ. Proc. Code section 377.60 against all Defendants; (6) negligence against all Defendants and (7) violation of California Civil Code section 52.1 against Does 1-10. (*Id.* ¶¶ 131-258.) On March 3, 2023, Defendants filed the instant motion to dismiss all causes of action and is fully briefed. (Dkt. Nos. 7, 12, 13.)

## Discussion

**A.     Legal Standard as to Federal Rule of Civil Procedure 12(b)(6)**

25CV3835-GPC(BLM)

Federal Rule of Civil Procedure ("Rule") 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Rule 12(b)(6) requires the Court to dismiss claims that fail to establish a cognizable legal theory or do not allege sufficient facts to support a cognizable legal theory. *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) (citation omitted). Under Rule 8(a)(2) a complaint must contain "a short and plain statement of the claim which entitles the pleader to relief." Fed. R. Civ. P. 8(a)(2).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.,* 572 F.3d 962, 969 (9th Cir. 2009) (quotations omitted).

To survive a Rule 12(b)(6) motion to dismiss, a complaint does not need detailed factual allegations but it must provide allegations that raise a right to relief above the speculative level. *Twombly*, 550 U.S. at 555. While the plausibility standard is not a probability test, it does require more than a mere possibility the defendant acted unlawfully. *Id.* at 556. "When evaluating a Rule 12(b)(6) motion, the Court must accept all material allegations in the complaint as true, and construe them in the light most favorable to the non-moving party." *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 956 (9th Cir. 2013) (citation omitted). When dismissal is appropriate, leave to amend should generally be given freely. *Id.* However, if the plaintiff's proposed

25CV3835-GPC(BLM)

amendment would fail to cure the pleading's deficiencies and amendment would be futile, the court may dismiss without leave. *Id*.

**B.    First Cause of Action – Fourteenth Amendment Due Process Violation, 42 U.S.C. § 1983 and Second Cause of Action – Right of Association, 42 U.S.C. § 1983 as to Doe 1**

Defendants move to dismiss the first and second causes of action for violations of the Fourteenth Amendment substantive due process clause arguing that there is neither a legal duty to render aid to Ms. Espinoza under the circumstances nor a duty to protect her from harm by third parties. (Dkt. No. 7-1 at 9-11.[1]) In addition, Defendants argue that the state-created danger doctrine does not apply in this case. (*Id.* at 12-13.) Plaintiffs respond that the state-created danger exception applies to the facts of this case notwithstanding that a State has no general duty to protect individuals. (Dkt. No. 12 at 12-17.)

Generally, "the Fourteenth Amendment's Due Process Clause . . . does not confer any affirmative right to governmental aid" and "typically does not impose a duty on the state to protect individuals from third parties." *Patel v. Kent Sch. Dist.,* 648 F.3d 965, 971 (9th Cir. 2011) (citations and alterations omitted). However, the State can be held liable under the Fourteenth Amendment's Due Process clause for failing to protect an individual from harm by third parties "where the state action 'affirmatively place[s] the plaintiff in a position of danger,' that is, where state action creates or exposes an individual to a danger which he or she would not have otherwise faced." *Henry A. v. Willden*, 678 F.3d 991, 1002 (9th Cir. 2012) (quoting *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006) (quoting *DeShaney v. Winnebago Cnty. Dept' of Soc. Servs.*, 489 U.S. 189, 197 (1989))). A plaintiff must allege the (1) officer's affirmative conduct exposed the plaintiff "to a foreseeable danger that she would not otherwise have

---

[1] Page numbers are based on the CM/ECF pagination.

25CV3835-GPC(BLM)

faced"; and (2) the officer acted with "deliberate indifference to a known or obvious danger." *Estate of Soakai v. Abdelaziz*, 137 F.4th 969, 982 (2025) (citations omitted).

To satisfy the first requirement, "Plaintiffs must plausibly allege that Defendants' affirmative actions (1) placed [Ms. Espinoza] in a worse position than they would have occupied had [Doe 1] not acted at all; (2) created or exposed [Ms. Espinoza] to an actual and particularized danger; and (3) resulted in foreseeable harm to [Ms. Espinoza]." *Id*. at 983 (citing *Polanco v. Diaz*, 76 F.4th 918, 926 (9th Cir. 2023), *cert. denied*, – U.S.–, 144 S. Ct. 2519 (2024)).

The complaint plausibly alleges a number of affirmative acts by Doe 1 that placed or exposed Ms. Espinoza to a situation that was more dangerous than the one she found her in.  Doe 1 allegedly lied to Dispatch that she had not seen Ms. Espinoza when she arrived at the scene, (Dkt. No. 1, Compl. ¶136), and then lied again that she would return to the scene but did not.  (*Id.* ¶ 130.)  Doe 1's affirmative conduct in lying to Dispatch that she would return to the scene prevented another officer from responding to assist Ms. Espinoza, (*id.* ¶¶ 140, 142).  *See Murguia v. Langdon*, 61 F.4th 1096, 1115 (9th Cir. 2023) (social worker lied about decedents' mother's history of abuse and circumstances to Officer, rendered the twins more vulnerable to physical injury and absent the affirmative misrepresentation Officer Garcia may have conducted an independent investigation into mother's criminal history and living situation prior to taking the family to a motel).

In addition, Doe 1 allegedly reached out and telephoned Mr. Quinones about Ms. Espinoza and angrily told him to "leave [the situation] alone" which intimidated him from calling the Sheriff's office again and also prevented a neighbor from reporting that she saw a suspicious man coming out from the area Ms. Espinoza had been seen because she had heard about Mr. Quinones encounter with Doe 1.  (*Id.* ¶¶ 66, 143, 152.)  Doe 1's affirmative conduct in calling Mr. Quinones intimidated him from calling the Sheriff's Department again and even prevented him from taking any further actions to help her. (*Id.* ¶¶ 152, 160.)  Doe 1's call to Mr. Quinones also prevented a neighbor from calling

25CV3835-GPC(BLM)

the Sheriff's Department about Ms. Espinoza when she saw a suspicious man in the area where Ms. Espinoza was last seen.  (*Id*. ¶¶ 64, 66, 147, 152.)

As such, Plaintiffs have plausibly alleged that Doe 1's actions placed Plaintiffs in a worse position than she would have been had Doe 1 not acted because if she had not lied and stated she would go to scene again, another deputy could have taken the call to assist Ms. Espinoza and if Doe 1 had not called Mr. Quinones, Mr. Quinones and his neighbor would have followed up with the Sheriff's Department.  As such, Doe 1 exposed Ms. Espinoza to potential danger and harm from the outside elements or third parties by affirmatively barring anyone from aiding her.  *See Murguia*, 61 F.4th at 1112 ("This court . . . [has] applied the state-created danger exception in situations where an officer abandoned the plaintiff in a dangerous situation, separated the plaintiff from a third-party who may have offered assistance, or prevented other individuals from rendering assistance to the plaintiff."); *Martinez v. City of Clovis*, 943 F.3d 1260, 1272 (9th Cir. 2019) (holding that police officer committed a constitutional violation by telling the plaintiff's abuser about the plaintiff's allegations of abuse against him and telling him that plaintiff was not "the right girl" for him, after which the abuser further physically abused the plaintiff).

Furthermore, Plaintiffs must allege that the injury must have been foreseeable to the defendant.  *Martinez*, 943 F.3d at 1273.  "This does not mean that the exact injury must be foreseeable.  Rather, 'the state actor is liable for creating the foreseeable danger of injury given the particular circumstances.'" *Id*. at 1273-74 (quoting *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1064 n.5 (9th Cir. 2006)).

Here, Plaintiffs sufficiently assert that the danger and harm to Ms. Espinoza was foreseeable because Doe 1 knew someone had called about a welfare check stating that a woman in distress was sitting in a ditch and had no food or water.  (Dkt. No. 1, Compl. ¶¶ 148-50.)  Plaintiffs have alleged that it was foreseeable that harm could occur if Doe 1 left Ms. Espinoza in her vulnerable condition without checking on her.  *See e.g., Estate of Soakai*, 137 F.4th at 983 ("It is entirely predictable that allowing seriously wounded

25CV3835-GPC(BLM)

individuals to go without aid for longer than necessary would increase the risk of further injury or death.")

As to the second requirement, "[d]eliberate indifference is 'a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'" *Patel*, 648 F.3d at 974 (quoting *Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997)). This standard is higher than gross negligence and requires a culpable mental state. *Id.* at 974. To satisfy deliberate indifference, "Plaintiffs must show that Defendants knew that their intentional actions would expose Plaintiffs to an unreasonable risk." *Estate of Soakai*, 137 F.4th at 984 (citing *Murguia,* 61 F.4th at 1117 n.16). In other words, "Plaintiffs must allege facts from which we can plausibly infer that Defendants "kn[ew] that something was going to happen, but 'ignored the risk and exposed [Plaintiffs] to it anyway.'" *Id.* (quoting *City of Clovis*, 943 F.3d at 1274); *Patel,* 648 F.3d at 900 (defendant "knows that something is going to happen but ignores the risk and exposes [the plaintiff] to it.").

Here, Plaintiffs allege that Doe 1 was deliberately indifferent to the known danger that Ms. Espinoza would become a victim of a crime or that she would die from exposure to the elements. (Dkt. No. 1, Compl. ¶ 153.) By answering the Dispatch call, Doe 1 knew that someone had called for a welfare check about a women in a ditch with no food or water. (*Id.* ¶¶ 28, 30.) Despite that, Doe 1 did not get out of her vehicle to even check or investigate before driving away and did not comply with Department policies regarding the mentally ill or the homeless population. (*Id.* ¶¶ 32, 33, 183, 198.) Later, when Mr. Quinones called a second time, Doe 1 reported she would return back to the scene but did not. (*Id.* ¶¶ 42, 43.) In fact, Doe 1 called Mr. Quinones, in an angry and irritated voice, and told him to "leave it alone." (*Id.* ¶¶ 44, 48-50.) The complaint plausibly alleges that Doe 1 by taking affirmative steps to prevent any assistance to Ms. Espinoza, she knew that Ms. Espinoza, in distress and without food and water sitting outside in the elements, would be subject to an unreasonable risk of harm. Accordingly,

25CV3835-GPC(BLM)

Plaintiffs have alleged that Doe 1 was deliberately indifferent to an obvious danger to Ms. Espinoza.

The Court concludes that Plaintiffs have plausibly alleged the state-created danger exception to support a claim for violations of Ms. Espinoza's Fourteenth Amendment substantive due process rights and DENIES Defendant's motion to dismiss on this claim.

**C.    Third Cause of Action – Failure to Properly Investigate, Supervise and Discipline, 42 U.S.C. § 1983 as to Sheriff Martinez and Supervisory Does 2-10**

Defendants move to dismiss the third cause of action arguing that Plaintiffs have failed to allege that Sheriff Martinez and Does 2-4 actively participated in, directed or actually knew of Doe 1's constitutional violations and failed to prevent them. (Dkt. No. 7-1 at 14.)  Defendants also contend that Does 5-10 should be dismissed because there are no specific allegations made against them. (*Id.*)  Plaintiffs oppose arguing that they have alleged Does 2-4 were aware of Doe 1's actions concerning Ms. Espinoza, and did nothing to assist her. (Dkt. No. 12 at 18-19.)  They also argue that they have alleged inaction by failing to train, supervise or discipline by Sheriff Marinez and Does 5-10, the policy setting supervisory defendants. (*Id.* at 19-20.)

For § 1983 supervisory liability, the Ninth Circuit has never required that a supervisor be directly and personally involved in the same way as are individual officers who are on the scene. *Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011).  A defendant may be held liable as a supervisor under § 1983 "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989).  The causal connection for individual capacity[2] supervisory liability can be shown by "[her] own culpable action or inaction in

---

[2] Defendant Sheriff Martinez is sued in her individual capacity. (Dkt. No. 1, Compl. ¶ 13.)  However, Plaintiffs do not allege in what capacity Does 2-4 are sued but the Court presume they are sued in their individual capacities. *See Romano v. Bible*, 169 F.3d 1182, 1186 (9th Cir. 1999) (Ninth Circuit "presume[s] that officials necessarily are sued in their personal capacities where those officials are

the training, supervision, or control of [her] subordinates; for [her] acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Starr*, 652 F.3d at 1205-06, 1208 (citations omitted).

As to Sheriff Martinez, the complaint alleges she was a policy-maker and responsible for the promulgation of policies and procedures that complied with state and federal Constitutions and California state laws. (Dkt. No. 1, Compl. ¶ 12.) She was also responsible for the supervision of officers employed by San Diego Sheriff's Office ("SDSO"). (*Id.*) Plaintiffs claim that Sheriff Martinez failed to properly supervise her employees regarding the dangers of dehydration and exposure and was personally aware of repeated violations of Constitutional rights committed by her subordinates through multiple prior complaints from citizens and victims. (*Id.* ¶¶ 171, 180.) She was aware that her deputies were treating "transient" or unhoused people differently than housed people and failed to ensure that deputies were providing equal services to all people and not subjecting homeless and mentally ill to increased danger by "deliberately castigating citizens for reporting dangerous situations in which such persons were exposed to risk of harm." (*Id.* ¶ 181.) She also knew that her deputies were violating SDSO's policies and procedures as it concerned the mentally ill and the homeless population as the Sheriff's Department website contained these statistics. (*Id.* ¶ 182.) Sheriff Martinez knew her deputies were failing to properly address the mentally ill by contacting PERT or the homeless by contacting CARE despite "the implementation of California state law as of October 2023." (*Id.* ¶ 183.) Because the number of complaints, investigations and findings are maintained by her Department, Sheriff Martinez was aware that her Department investigates only a miniscule number of citizen complaints. (*Id.* ¶ 185.) According to Plaintiffs, the Sheriff's Department initiates full Internal Affairs ("IA") investigations for about 15% of misconduct complaints by SDSO employees and for

named in a complaint, even if the complaint does not explicitly mention the capacity in which they are sued.") (citations omitted).

25CV3835-GPC(BLM)

citizen complaints like Mr. Quinones, the rate of full investigation is less than 2 percent. (*Id.* ¶ 125.) Since Sheriff Martinez signs off on IA documents, she was aware that not many misconduct cases are being investigated. (*Id.* ¶ 186.)

Here, Plaintiffs provide broad, summary allegations of supervisory liability and fail to present specific assertions that Sheriff Martinez was provided notice, or in fact knew, of any prior incidents of deputies failing to protect an individual from harm after taking affirmative acts and placing that individual in harms way. *See Hydrick v. Hunter,* 669 F.3d 937, 941 (9th Cir. 2012) (finding supervisory-liability allegations insufficient explaining that decision in *Starr* depended on "detailed factual allegations" of complaint). As such, Plaintiffs have not sufficiently alleged that Sheriff Martinez had "knowledge of" and "acquiesce[d] in" the alleged unconstitutional conduct of her subordinates, *see Starr,* 652 F.3d at 1207, and the Court GRANTS Defendant's motion to dismiss the third cause of action as to Sheriff Martinez.

As to Does 2-4, Plaintiffs allege they are Doe 1's supervisors and had access to Doe 1's real time activities on that day. (Dkt. No. 1, Comp. ¶ 56.) As such, Does 2-4 knew that Doe 1 left the scene in less than two minutes, knew that Mr. Quinones called within one minute of Doe 1 leaving to complain and informed Dispatch that she was still in the ditch. (*Id.* ¶¶ 56, 57, 58, 173.) They also knew Doe 1 did nothing to help Ms. Espinoza knowing that she was still in the ditch. (*Id.* ¶¶ 59, 174.) They knew that Doe 1 reported that she would be returning to the scene but did not and did nothing to supervise or intervene by sending another deputy to the scene. (*Id.* ¶¶ 60, 175.) On information and belief, Does 2-4 knew Doe 1 called Mr. Quinones to dissuade him from calling for help or providing assistance to Ms. Espinoza. (*Id.* ¶ 177.) Construing the facts in the light most favorable to Plaintiffs, the Court concludes that they have plausibly alleged that Does 2-4 were aware of Doe 1's conduct and failed to take action and should have reasonably known that Doe 1's actions and inactions would cause a constitutional injury to Ms. Espinoza. Thus, the Court DENIES this claim as to Does 2-4.

25CV3835-GPC(BLM)

Finally, Defendants argue that Does 5-10 must be dismissed because the complaint fails to allege any specific allegations concerning them.  (Dkt. No. 7-1 at 15.)  Plaintiffs disagree but also argue that dismissal would be premature without giving them an opportunity to identify them in discovery.  (Dkt. No. 12 at 19 n.5.)

The Court agrees with Defendants that Plaintiffs have not provided any specific allegation as to Does 5-10.  The complaint solely alleges that "Does 5-10 were aware of prior misconduct of Does 1-4 but failed to take action and failed to investigate and discipline them."  (*See* Dkt. No. 1, Compl.)  Conclusory allegations without any specific facts do not state a claim.  *See Iqbal*, 556 U.S. at 678 (conclusory allegations listing the elements of a claim do not state a plausible claim).

The Court also considers whether Doe 5-10's dismissal would be premature.  Although the Ninth Circuit disfavors the use of "John Doe" to identify a defendant, in certain instances where the defendants' identities are not known prior to filing the action, an action should not be dismissed without giving the plaintiffs "an opportunity through discovery to identify the unknown defendants, unless it is clear that discovery would not uncover the identities, or that the complaint would be dismissed on other grounds." *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980).  Even though the identity of Doe Defendants may not be known, the complaint must allege facts to state a claim against them.  *See Wakefield v. Thompson*, 177 F.3d 1160, 1163 (9th Cir. 1999) ("The more substantive question we must resolve is whether the district court's dismissal of the complaint against Doe was appropriate because, even if Doe's identity is discovered, the complaint would have to be dismissed on other grounds.")  Here, because Plaintiffs have failed to make any allegations as to Does 5-10, the Court GRANTS Defendants' motion to dismiss Does 5-10 for failing to state a claim.

In conclusion, the Court GRANTS in part and DENIES in part Defendant's motion to dismiss the third cause of action.

**D.      Fourth Cause of Action – *Monell* Unconstitutional Policy, Custom or Practice as to County of San Diego**

15

25CV3835-GPC(BLM)

Cities, counties and other local government entities are subject to claims under 42 U.S.C. § 1983. *Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658 (1978). While municipalities, their agencies and their supervisory personnel cannot be held liable under § 1983 on any theory of respondeat superior or vicarious liability, they can, however, be held liable for deprivations of constitutional rights resulting from their formal policies or customs. *Id.* at 691-93. Liability only attaches where the municipality itself causes the constitutional violation through "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.* at 694.

To prevail, a plaintiff must allege "(1) [the plaintiff] had a constitutional right of which he was deprived; (2) the municipality had a policy; (3) the policy amounts to deliberate indifference to his constitutional right; and (4) 'the policy is the moving force behind the constitutional violation.'" *Gordon v. Cnty. of Orange*, 6 F.4th 961, 973 (9th Cir. 2021) (citing *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011)). Even if there is no formal or written official policy, a public entity may be liable for a "longstanding practice or custom which constitutes the standard operating procedure of the local government entity." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). The custom or practice must "be so 'persistent and widespread' that it constitutes a 'permanent and well settled city policy.'" *Id.* (quoting *Monell*, 436 U.S. at 691). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Id.*

As to a municipality's policy, a "plaintiff must allege either that (1) a particular municipal action itself violates federal law, or directs an employee to do so; or (2) the municipality, through inaction, failed to implement adequate policies or procedures to safeguard its community members' federally protected rights." *Hyun Ju Park v. City and Cnty. of Honolulu*, 952 F.3d 1136, 1141 (9th Cir. 2020) (internal quotation marks and citations omitted).

25CV3835-GPC(BLM)

In this case, Plaintiffs assert liability based on a failure to act; therefore, they must allege the County acted with deliberate indifference which is "a stringent standard of fault, requiring proof that a [municipality] disregarded a known or obvious consequence of [its] action." *Bd. of the Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997) ("Claims not involving an allegation that the municipal action itself violated federal law, or directed or authorized the deprivation of federal rights, present much more difficult problems of proof.") (citations omitted); *see also Hyun Ju Park*, 952 F.3d at 1141 ("When, as here, a plaintiff pursues liability based on a failure to act, she must allege that the municipality exhibited deliberate indifference to the violation of her federally protected rights.") (citing *Tsao v. Desert Palace, Inc.,* 698 F.3d 1128, 1143 (9th Cir. 2012)).

A plaintiff alleging deliberate indifference can survive a Rule 12(b)(6) challenge if he or she alleges the municipality has engaged in a pattern of prior, similar violations of federally protected rights of which it had actual or constructive notice. *See Connick v. Thompson*, 563 U.S. 51, 62 (2011) ("A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference . . . ."); *Starr*, 652 F.3d at 1216-17 (reversing dismissal where plaintiff "specifically allege[s] numerous incidents" of prior, similar incidents of excessive force and the defendant was provided notice of all these incidents); *Bagos v. Vallejo*, No. 2:20-cv-00185-KJM-AC, 2020 WL 6043949, at *5-6 (E.D. Cal. Oct. 13, 2020) ("[p]rior incidents involving lawsuits alone, even those which do not result in a finding or admission of wrongdoing, can be sufficient for *Monell* liability purposes in the face of a motion to dismiss."); *Villa v. Cnty. of San Diego,* Case No.: 20-CV-537-CAB-NLS, 2020 WL 5535384, at *3-4 (S.D. Cal. Sept. 15, 2020) (denying motion to dismiss *Monell* claim of policy and custom and failure to train claim as the plaintiff referenced federal investigations, citizen complaints and lawsuits against the County that include similar allegations of misconduct).

25CV3835-GPC(BLM)

Here, Plaintiffs allege a number of customs and practices of the County that amount to deliberate indifference to Ms. Espinoza's constitutional rights. Plaintiffs allege the County had a longstanding policy of:

1. "allowing its staff to ignore people in distress and not disciplining deputies who engage in misconduct", (Dkt. No. 1, Compl. ¶ 200);

2. failing to investigate and discipline when citizens complain about deputy misconduct, (*id.* ¶¶ 200, 201);

3. disbelieving or discrediting civilian complaints resulting in a pattern where such complaints are sent directly to the deputy who was the subject of the complaint rather than his supervisor, (*id.* ¶¶ 202, 203);

4. not disciplining deputies who engage in misconduct, allowing staff to file incomplete or inaccurate reports to make false statements and to obstruct or interfere with investigations by withholding material information, (*id.* ¶¶ 205, 206);

5. falsifying information during investigations of misconduct and misleading the investigation by the independent citizens' review board, (*id.* ¶ 207);

6. covering up misconduct of deputies and hiding the facts from the public to prevent scrutiny, (*id.* ¶ 208); and

7. failing to discipline and train deputies, (*id.* ¶ 111).

In support, Plaintiffs provide allegations of instances of County misconduct of cover ups and history of misconduct. (*Id.* ¶¶ 113-124.) These instances concern assault and use of excessive force by deputies who were allegedly never disciplined and an alleged cover up by Sheriff Martinez misleading family members of a victim that there was no wrong doing by the Department when in fact an IA investigation found a deputy engaged in misconduct. (*Id.* ¶¶ 122-23.)

However, these examples of prior instances of alleged misconduct are not similar to the violations in his case where Plaintiffs allege the Defendants violated Ms. Espinoza's Fourteenth Amendment substantive due process clause right under the state-created danger theory. *See Connick*, 563 U.S. at 62 ("A pattern of similar constitutional

violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference . . . ."). Further, the alleged policy of failing to investigate citizens' complaints and disbelieving or discrediting civilian complaints is attributable to Mr. Quinones' second call. However, Plaintiff has not plausibly alleged that Mr. Quinones made a citizens' complaint. Plaintiffs allege that on the second call, Mr. Quinones reported that Ms. Espinoza remained near the ditch and was not gone as Doe 1 had reported; he did not complain. (*Id.* ¶ 40.) Therefore, the policies concerning citizens' complaints do not support a *Monell* claim. Finally, the alleged policy of falsifying information during investigations of misconduct and misleading the investigation by the independent citizens' review board and covering up misconduct of deputies and hiding the facts from the public to prevent scrutiny do not arise from the facts of this case, and do not support a *Monell* claim. Because Plaintiffs have not sufficiently alleged a *Monell* claim against the County of San Diego, the Court GRANTS Defendants' motion to dismiss the *Monell* claim.

**E.     Fifth Cause of Action - Wrongful Death, Cal. Civ. Proc. Code section 377.60 and Sixth Cause of Action – Negligence against All Defendants**

Defendants move to dismiss the wrongful death and negligence claims because Plaintiffs have not sufficiently alleged Defendants owed a duty of care to Ms. Espinoza necessary to plead both claims. (Dkt. No. 7-1 at 19-20.) Plaintiffs argue that they have stated a duty of care under the "negligent undertaking" doctrine, an exception to the "no duty to aid" rule. (Dkt. No. 12 at 25-26.)

Under California law, the elements of a negligence claim are (1) duty to use due care, (2) breach of that duty, (3) that the defendant's breach caused the injury suffered, and (4) the plaintiff suffered an injury. *Vasilenko v. Grace Family Church*, 3 Cal. 5th 1077, 1083 (2017). "The elements of the cause of action for wrongful death are the tort (negligence or other wrongful act), the resulting death, and the damages, consisting of the pecuniary loss suffered by the heirs." *Quiroz v. Seventh Ave. Ctr.*, 140 Cal. App. 4th

25CV3835-GPC(BLM)

1256, 1263 (2006) (emphasis omitted) (citation omitted).  Both causes of action require Plaintiffs to allege that Defendants owed them a duty to use due care.

"As a rule, one has no duty to come to the aid of another." *Williams v. State of Cal.*, 34 Cal. 3d 18, 23 (1983).  However, under the negligent undertaking rule or the Good Samaritan Rule, "a volunteer who, having no initial duty to do so, undertakes to provide protective services to another, will be found to have a duty to exercise due care in the performance of that undertaking if one of two conditions is met: either (a) the volunteers failure to exercise such care increases the risk of harm to the other person, or (b) the other person reasonably relies upon the volunteers undertaking and suffers injury as a result." *Delgado v. Trax Bar & Grill*, 36 Cal. 4th 224, 249 (2006).  The negligent undertaking theory applies to the police and the breach of the duty may be an affirmative act or an omission or failure to act that places the individual in peril or increases the risk of harm. *See Williams v. State of Cal.*, 34 Cal. 3d 18, 24 (1983).

Plaintiffs must allege that Defendants' acts increased the harm or risk of the harm inflicted by the third party.  *Golick v. State of Cal.*, 82 Cal. App. 5th 1127, 1146 (2022).  "[T]o state a claim for affirmatively increasing a risk of harm," a plaintiff must demonstrate "a 'direct connection' between the [defendant's] challenged conduct and some risk of harm or heightened risk of harm [from the third party's wrongful conduct] that would not otherwise have arisen if not for the defendant's conduct." *Id.* at 1147 (alleged connections between officer's conduct and third party's shooting spree were "little more than speculation" and insufficient to support a finding of duty under the negligent undertaking doctrine).

Here, Doe 1's act of answering the Dispatch call but then leaving the scene without getting out of her vehicle to render aid increased Ms. Espinoza's exposure to danger.  Her act of telling Dispatch that she would return to the scene but did not also increased Ms. Espinoza's risk of harm.  Lastly, Doe 1's telephone call to Mr. Quinones telling him to leave the situation alone which had the consequence of intimidating him from making any further calls to the Sheriff's Office or even trying to assist Ms. Espinoza created a

25CV3835-GPC(BLM)

heightened risk of harm for her. By her actions, Plaintiffs have alleged that Doe 1 owed a duty of care to Ms. Espinoza under the negligent undertaking doctrine. As such, the Court DENIES Defendant's motion to dismiss the negligence and wrongful death causes of action.

**F.      Seventh Cause of Action – Bane Act as to Does 1-10**

Defendants move to dismiss the Bane Act claim as to Does 1-10 because Plaintiffs have failed to allege they engaged in any intentional act violating Ms. Espinoza's constitutional rights. (Dkt. No. 7-1 at 20.) Second, Defendants maintain that Plaintiffs have failed to allege an underlying constitutional violation as to Does 1-10.[3] (*Id.* at 20-21.) Plaintiffs respond that they have sufficiently alleged a Bane Act cause of action because they alleged that Defendants violated Ms. Espinoza's due process rights with deliberate indifference and Doe 1 interfered with rescue efforts in a coercive, threatening and intimidating manner through her interaction with Mr. Quinones which is sufficient to allege a claim under the Bane Act. (Dkt. No. 12 at 27.)

The Bane Act provides a private cause of action against anyone who "interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by an individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of California." Cal. Civil Code § 52.1(b) & (c); *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018) (the Bane Act "protects individuals from conduct aimed at interfering with rights that are secured by federal or state law, where the interference is carried out 'by threats, intimidation or coercion.'"). To state a

---

[3] Defendant also argues that even though the claim is alleged against Does 1-10, the cause of action includes an allegation that the County is vicariously liable. (Dkt. No. 7-1 at 21.) In reply, Plaintiffs do not address whether they intended to alleged vicarious liability as to the County. The complaint alleges that the Bane Act claim is against Does 1-10, (Dkt. No. 1, Comp. at p. 30), but includes a summary allegation that the County is vicariously liable under Cal. Gov't Code section 815.2. (*Id.* ¶ 237.) Because Plaintiffs do not address the issue in their reply, the Court finds that they concede to Defendants' argument that the claim against the County, if alleged, should be dismissed.

25CV3835-GPC(BLM)

claim under the Bane Act, Plaintiffs must allege "(1) interference with or attempted interference with a state or federal constitutional or legal right, and (2) the interference or attempted interference was by threats, intimidation, or coercion." *Allen v. City of Sacramento*, 234 Cal. App. 4th 41, 67 (2015). "The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law." *Austin B. v. Escondido Union School Dist.*, 149 Cal. App. 4th 860, 882 (2007).

The seventh cause of action alleges a violation of California's Bane Act, California Civil Code section 52.1, for violations of the United States and California constitutions and California Civil Code section 43. (Dkt. No. 1, Compl. ¶ 250.) Specifically, the complaint alleges that Defendants Does 1-10 violated Ms. Espinoza's

a. [t]he right to be free from objectively unreasonable treatment and deliberate indifference to Irma Espinoza's serious medical needs as secured by the Fourteenth Amendments to the United States Constitution and by California Constitution, Article 1, §§ 7 and 13;

b. [t]he right to enjoy and defend life and liberty; acquire, possess, and protect property; and pursue and obtain safety, happiness, and privacy, as secured by the California Constitution, Article 1, § 1; and

c. [t]he right to protection from bodily restraint, harm, or personal insult, as secured by California Civil Code § 43.

(*Id.* ¶ 250.) They also allege that Defendants' due process violations with deliberate indifference constitute violations of the Bane Act. (*Id.* ¶ 251.) Finally, Plaintiffs assert that Defendants deprived Ms. Espinoza life-saving care by threatening and preventing others from providing her safety. (*Id.* ¶ 252.)

As to the underlying federal constitutional rights underlying the Bane Act, Plaintiffs offer alternative theories. First, there is a claim for deliberate indifference to

25CV3835-GPC(BLM)

serious medical needs.  (*Id.* ¶ 250(a)).  District courts have held that a Bane Act claim may be based on a claim for deliberate indifference to serious medical needs under the Eighth Amendment, for prisoners, or Fourteenth Amendment,[4] for pretrial detainees. *M.H. v. Cnty. of Alameda*, 90 F. Supp. 3d 889, 898-99 (N.D. Cal. 2013) (concerning deceased inmate); *see Lapachet v. California Forensic Med. Grp., Inc.*, 313 F. Supp. 3d 1183, 1195 (E.D. Cal. 2018) (concluding that threats, coercion and intimidation are inherent in deliberate indifference claim raised by inmate).  In *Cornell,* the court of appeal approved *M.H.'s* holding that a Bane Act claim may be based on allegations of "deliberate indifference to prisoner's medical needs."  *Cornell v. City & Cnty. of San Francisco*, 17 Cal. App. 5th 766, 802 n.31, *as modified* (Nov. 17, 2017).  A Bane Act claim for deliberate indifference to medical needs under the Fourteenth Amendment has been limited to pre-trial detainees and Plaintiffs have not provided legal authority that they, on behalf of Ms. Espinoza, a non-detained individual, may bring a Fourteenth Amendment claim for deliberate indifference to serious medical needs.

Plaintiffs also assert a Bane Act claim based on the due process failure to protect under the Fourteenth Amendment.[5]  (Dkt. No. 7-1 at 20-21; Dkt. No. 12 at 27.)  Here, Doe 1 had no interaction with Ms. Espinoza that forced her to do something that she was not required to do or prevented her from doing something she had a right to do.  Rather, Plaintiffs allege the "coercion" element premised on Doe 1's interference with any attempt to aid Ms. Espinoza through her law enforcement position which ensured Ms. Espinoza was denied aid through other means.  (Dkt. No. 12 at 27.)  Specifically, Doe 1 ignored Ms. Espinoza on arrival after the first call and even after Mr. Quinones' second

---

[4] "[M]edical care claims brought by pretrial detainees ... 'arise under the Fourteenth Amendment's Due Process Clause, rather than under the Eighth Amendment's Cruel and Unusual Punishments Clause.'" *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124 (9th Cir. 2018) (citation omitted).

[5] Plaintiffs argue that a violation of due process rights with deliberate indifference, by itself, constitutes a violation of the Bane Act and cites multiple cases for this proposition.  (Dkt. No. 12 at 27 n.7.) However, context matters, all of these cases involved excessive force, unlawful arrests or inadequate medical care for prisoner/detainees.  None address the precise rights that are presented here.

25CV3835-GPC(BLM)

call, left her in a state of distress without food and water.  Afterwards, Doe 1 allegedly had contact with Mr. Quinones and affirmatively directed him to stop calling the Sheriff's Department to provide aid to Ms. Espinoza.  Neither side has provided any legal authority as to whether and how the coercion element can be asserted on a Fourteenth Amendment failure to protect claim under the state-created danger exception.  Nor have the parties addressed whether the coercion/intimidation element can be met by the alleged intimidation of a member of the public who is reporting a person in distress.

The Court acknowledges that there is a lack of clear precedent on the requirements for Bane Act liability.  *See Sandoval v. Cnty. of Sonoma*, 912 F.3d 509, 519 (9th Cir. 2018) (recognizing that because the California Supreme Court has not addressed the elements of a Bane Act claim, the Ninth Circuit and California Court of Appeals "have struggled to articulate clearly when Bane Act liability attaches[]").  In *Sandoval*, relying on *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1044 (9th Cir. 2018), the Ninth Circuit explained that a plaintiff must show an independent coercion when the defendant's conduct is negligent in violating the plaintiff's constitutional rights; however, the "coercion inherent in a Fourth Amendment violation could support a Bane Act claim if the coercion occurred with "specific intent to violate the arrestee's right to freedom from unreasonable seizure."  *Id*. at 519-20 (Fourth Amendment unlawful seizure claim for impounding vehicles).

To the extent Plaintiffs' theory of liability is viable, the question is whether Plaintiffs have alleged that Does 1-10 had the specific intent to violate Ms. Espinoza's due process rights.  *See Sandoval*, 912 F.3d at 520 (the plaintiffs must show that the County and City impounded the plaintiffs' cars with the specific intent to violate their Fourth Amendment rights).  Here Plaintiffs allege that Defendants acted with reckless disregard to Ms. Espinoza's rights.  (Dkt. No. 1, Compl. ¶ 256.)  At this stage, without full briefing on this issue and viewing the facts most favorable to Plaintiffs, the Court accepts that the alleged intimidation of Mr. Quinones to deter him from curing Doe 1's failure to summon medical care qualifies as intimidation which interfered with

Espinoza's due process right to affirmative aid under the Fourteenth Amendment and was committed with the specific intent to violate Espinoza's due process rights. Accordingly, the Court DENIES Defendants' motion to dismiss.

**G.     Leave to Amend**

To the extent the Court finds any deficiencies, Plaintiffs seek leave to amend. (Dkt. No. 12 at 28.) Because leave to amend should be freely granted and would not be futile, the Court GRANTS Plaintiffs' request for leave to amend. *See Chubb*, 710 F.3d at 956.

**Conclusion**

Based on the above, the Court GRANTS in part and DENIES in part Defendants' motion to dismiss Defendants' motion to dismiss with leave to amend. Plaintiffs may file an amended complaint on or before **June 1, 2026**.

IT IS SO ORDERED.

Dated:  May 7, 2026

Hon. Gonzalo P. Curiel
United States District Judge

25CV3835-GPC(BLM)